UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SMALL BUSINESS IN TRANSPORTATION COALITION, <br><br> Plaintiff, <br><br> v. <br><br> MURIEL BOWSER, et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Civil Case No. 20-2645 (RJL) <br> ) <br> ) <br> ) <br> ) |

MEMORANDUM OPINION
(June 28, 2022) [Dkt. ## 23, 24]

The Small Business in Transportation Coalition ("SBTC" or "plaintiff") brought this action challenging the denial of SBTC's request to paint "Trucker Lives Matter" on a city street by defendants, the mayor and two members of the municipal government of Washington, DC (together, "defendants" or "the District"). SBTC claims this denial constitutes viewpoint discrimination in violation of the First Amendment in light of the fact that the phrase "Black Lives Matter" was painted on a street elsewhere in the city. Pending before me are the parties' cross-motions for summary judgment. Upon consideration of the pleadings, the record, and the relevant law, and for the reasons stated below, defendants' motion for summary judgment is **GRANTED** and plaintiff's motion is **DENIED**.

## BACKGROUND[1]

The tragic death of George Floyd at the hands of a Minneapolis police officer who was arresting him sparked a nationwide series of protests and violent demonstrations in the summer of 2020. The District of Columbia was not spared ! Indeed, in the area of Lafayette Square facing the White House, demonstrators clashed with law enforcement personnel for days, and President Trump had to deploy federal law enforcement officers to forcibly clear the Square. *See, e.g., Penkoski v. Bowser*, 548 F. Supp. 3d 12, 17–18 (D.D.C. 2021). On June 5, 2020, defendant Muriel Bowser, the mayor of Washington ("Bowser" or "Mayor Bowser"), directed the D.C. Department of Public Works ("DPW") to commission a mural to be painted in the area. DPW employees complied and, together with a group of local artists, painted "Black Lives Matter" in large yellow letters, along with an image of the flag of the District of Columbia in the same yellow color, on the roadway in the block of 16th Street NW just north of Lafayette Square. *See* Compl. ¶¶ 7–9 [Dkt. #1]; Pl.'s Mem. of Points and Auth. in Support of Mot. for Summ. J. ("Pl.'s Mem.") at 2 [Dkt. # 23-1]; Pl.'s Statement of Material Facts Not in Dispute ("Pl.'s Statement") ¶ 3 [Dkt. # 23-2]; Defs.' Statement of Undisputed Facts ¶¶ 1–2 ("Defs.' Statement") [Dkt. # 24-2].[2] That morning, Bowser gave a press conference where she described the mural as

---

[1] The parties have filed cross-motions for summary judgment and stated that no material facts remain in dispute. *See* Pl.'s Mot. for Summ. J. [Dkt. # 23]; Defs.' Mem. of Points and Auth. in Support of Mot. for Summ. J. ("Defs.' Mem.") at 2 [Dkt. # 24-1]; *see also* Parties' Joint Meet and Confer Report at 3. The facts recounted here, therefore, are drawn from the parties' respective statements of undisputed material facts. Though, as noted below, each party has submitted filings disputing certain statements made by the other, those statements are either immaterial facts (and not recounted here) or merely legal conclusions.

[2] The phrase "Black Lives Matter" is more than just a rallying cry admonishing others to value the lives of young black men. Indeed, "Black Lives Matter" is also the name of a network of organizations and a foundation that fundraise, organize, and conduct public demonstrations throughout the nation to protest police misconduct against black suspects and related issues. *See, e.g., Black Lives Matter D.C. v. Trump*, 544 F. Supp. 3d 15, 36 (D.D.C. 2021);

2

"sen[ding] a message" from the District; when asked about the mural's permanence, she further noted that, "[l]ike all of our public art, it stays." Defs.' Statement ¶¶ 4–5.

On June 6, 2020, activists altered the portion of the mural containing the D.C. flag by painting over the flag's three stars and adding the phrase "Defund the Police" in the same color and font adjacent to the existing mural, with the effect that the mural appeared to read "Black Lives Matter = Defund the Police." *Id.* ¶ 9. The following day, District employees repainted the stars but left intact the "Defund the Police" wording. *Id.* ¶ 10. In August 2020, at Mayor Bowser's direction, DPW employees painted over the "Defund the Police" wording during a re-paving of 16th Street NW, while the original "Black Lives Matter" mural remained intact. *See id.* ¶ 12.[3]

Later in August 2020, SBTC sent a letter to defendant Bowser and to the Attorney General of the District of Columbia, Karl Racine, "to request a permit or other lawful approval" for SBTC to paint the phrase "Trucker Lives Matter" on a street near the headquarters of the U.S. Department of Transportation in the District. Compl. ¶¶ 14–15. On September 3, 2020, SBTC wrote to Deputy Mayor John Falcicchio to follow up on the letter to Mayor Bowser; Deputy Mayor Falcicchio directed SBTC to contact defendant Everett Lott ("Lott"), the Deputy Director of the D.C. Department of Transportation ("DDOT"). *Id.* ¶¶ 16–17. Lott, in turn, referred SBTC's inquiry to defendant Matthew Marcou ("Marcou"), the Associate Director for Public Space Regulations at DDOT. *See*

---

*see also, e.g.*, Nicholas Kulish, *Black Lives Matter Foundation Discloses Assets of $42 Million*, N.Y. TIMES, May 18, 2022, at B1.

[3] In October 2021, the District completed its work to make the mural on 16th Street permanent, with new traffic patterns and a pedestrian walkway added to the block incorporating the mural. Defs.' Statement ¶ 18.

*id.* ¶ 18. On September 8, 2020, SBTC sent a follow-up email to Marcou repeating the request; later that day, Marcou responded to SBTC stating the following:

> The District Department of Transportation (DDOT) does not issue permits to install markings on open DC roadways or sidewalks. The District Government may commission markings on roadways and sidewalks. The District Government may also allow markings as part of a special event on roadways and sidewalks that are closed or restricted by DDOT or MPD, provided that the installations are only temporary and removed prior to the re-opening of the restricted areas.

*Id.* ¶¶ 19–22. In a series of follow-ups responding to Marcou, SBTC inquired why the District government was not giving SBTC's request "the same level of consideration it gave to Black Lives Matter, Inc.;" asked to be permitted to paint streets "[j]ust like the city granted that right to BLM;" and ultimately stated that it considered the government's having "allotted public space in the District" to Black Lives Matter but not to the SBTC's proposed mural to be "viewpoint discrimination." *Id.* ¶¶ 23–29. Deputy Mayor Falcicchio twice informed SBTC that "painting on the . . . streets [was not] an option" and "not feasible" but that DDOT could "advise on use of public space nearby" for another display. *Id.* ¶¶ 25, 28. On September 18, 2020, SBTC filed the present lawsuit alleging that the District's denial of SBTC's request constituted a First Amendment violation. The parties have since filed cross-motions for summary judgment, which are now pending before me.

## **LEGAL STANDARD**

The Court must enter summary judgment for a moving party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties agree that there are no facts in dispute that are material to the merits of plaintiff's First Amendment claim, *see,*

4

*e.g.*, Parties' Joint Meet and Confer Report at 3, and the record before the Court gives me no basis on which to disagree.[4] The question before me, then, is whether the undisputed record establishes that the District violated the Constitution, as plaintiff maintains, or that it was acting within its constitutional authority, as the District contends in response.

## ANALYSIS

SBTC brings one claim against the defendants in this matter, asserting that the District violated SBTC's First Amendment rights by allowing "Black Lives Matter" to be painted on the District's streets while "failing to provide a reasonable basis for denying Plaintiff" the right to paint, or have the District paint, SBTC's proposed "Trucker Lives Matter" message on another street. *See* Compl. ¶¶ 39–41.[5] SBTC submits that this alleged course of action constitutes viewpoint discrimination. Put differently, SBTC's claim is that the District had created a public forum in which it had allowed certain viewpoints to be expressed while censoring SBTC's message. In effect, SBTC is asking this Court to conclude that the District was obligated to espouse SBTC's message through a street mural because a mural saying "Black Lives Matter" was painted and endorsed by the District. For its part, the District argues primarily that the painting of the mural did not reflect or

---

[4] To be sure, the District did submit a response to SBTC's Statement of Material Facts Not in Dispute, as required by Local Rule 7(h)(1), in which it disputed certain facts averred by the plaintiff and argued that others were merely legal conclusions. *See* Defs.' Response to Plaintiff's Statement of Undisputed Material Facts [Dkt. # 26-1]. However, the facts identified by the District as disputed in its response are not material to SBTC's claims and thus pose no barrier to my entry of summary judgment at this stage. For its part, SBTC included in its opposition a "Statement of Genuine Issues of Material Fact in Dispute," *see* Pl.'s Mot. in Opp. to Defs.' Mot. for Summ. J. at 23–24 [Dkt. # 25], but each of the "facts" that plaintiff identifies as disputed therein are instead only legal conclusions, such as whether the mural is government speech for purposes of the First Amendment or whether the District engaged in viewpoint discrimination, *see id.*

[5] Plaintiff styles this claim as a "violation of 42 U.S.C. § 1983," *see* Compl. ¶¶ 39–41, but the Court will construe the claim to be one alleging a violation of the First Amendment by the defendant District officials, which may be brought in federal court under § 1983.

5

otherwise bring about the creation of a public forum, but instead was government speech, with the District speaking the message embodied by the mural on its own behalf.[6]

It is well established that "[t]he First Amendment's Free Speech Clause does not prevent the Government from declining to express a view." *Shurtleff v. Boston*, 142 S. Ct. 1583, 1589 (2022) (citing *Pleasant Grove City v. Summum*, 555 U.S. 460, 467–69 (2009)). "When the Government wishes to state an opinion, to speak for the community, to formulate policies, or to implement programs, it naturally chooses what to say and what not to say." *Id.*; *see also Nat'l Endowment for Arts v. Finley*, 524 U.S. 569, 598 (1998) (Scalia, J., concurring in judgment) ("It is the very business of government to favor and disfavor points of view."). Indeed, for Government to work, private parties cannot invoke the protections of the First Amendment to force their elected officials to espouse other views; instead, it is through the ballot box that such parties may provide a check on the Government's own speech. *See Shurtleff*, 142 S. Ct. at 1589.

However, where the Government is not itself the speaker of a message, but instead has created or maintained a forum for the expression of private speakers' views, governmental action is indeed constrained to varying degrees by the First Amendment. *See, e.g., Summum*, 555 U.S. at 469–70. And in that context, rejection of a given viewpoint may no longer merely be an expression of the Government's views, but rather the impermissible censorship of private citizens' views. *Shurtleff*, 142 S. Ct. at 1589; *see also*

---

[6] The District presents additional grounds for entry of summary judgment on its behalf, including that SBTC was required to establish that the claimed constitutional violation was the result of a policy or custom and failed to do so. *See, e.g.*, Defs.' Mem. at 20–30. However, because, as discussed below, I find that no constitutional violation occurred, I need not address this additional argument.

6

*id.* at 1595–96 (Alito, J., concurring in the judgment). For this reason, discerning whether the Government is speaking on its own behalf in a given case is often of dispositive importance. *Id.* at 1596 (Alito, J., concurring in the judgment) ("The ultimate question is whether the government is actually expressing its own views or the real speaker is a private party and the government is surreptitiously engaged in the 'regulation of private speech.'" (quoting *Summum*, 555 U.S. at 467)). This indeed is one such case. If the "Black Lives Matter" mural expresses the message of the District as a speaker, SBTC has no constitutional basis to compel the District to express SBTC's additional, preferred message.

Resolving this question, of course, can at times be a difficult undertaking. Governments do not speak exclusively through the words of elected officials or other quintessentially governmental channels. Instead, they have historically employed a multitude of media and speakers—including private parties—to communicate their messages. And where the Government speaks via these less typical means, courts "must be very careful" in assessing whether it is in fact the Government that is speaking in a given case. *Id.* at 1595. In its recent efforts at such assessments, the Supreme Court has undertaken a "holistic inquiry" that has considered as evidence, for example, "the history of the expression at issue; the public's likely perception as to who (the government or a private person) is speaking; and the extent to which the government has actively shaped or controlled the expression." *Id.* at 1589–90 (majority opinion) (citing *Walker v. Texas Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 209–14 (2015)); *see also Penkoski*, 548

F. Supp. 3d at 22.[7] The thrust of the inquiry, though, is whether the Government has purposefully communicated a message of its own choosing. *See Shurtleff*, 142 S. Ct. at 1598–99 (Alito, J., concurring in the judgment) (citing *Summum*, 555 U.S. at 472).

Here, the undisputed factual record compels the conclusion that the mural is government speech. Indeed, the mural constituted a purposeful communication of a chosen message by Mayor Bowser on behalf of the District. This conclusion is buttressed by my findings that the public would reasonably have viewed the mural as spoken by the Government and that the District exercised ongoing, if imperfect, control over the mural's message and form—the second and third factors identified by the Supreme Court in *Summum*.[8] SBTC itself concedes that the mural was created in the first instance by a group that included employees of the District and that Mayor Bowser the next morning took full credit for its existence. Indeed, Mayor Bowser was explicit in her endorsement of the mural's message, stating that the mural came about because "[w]e had the opportunity to

---

[7] In the Supreme Court's most recent government-speech case, the majority opinion relied on these enumerated factors but noted the inquiry is "not mechanical . . . it is driven by a case's context rather than the rote application of rigid factors." *Shurtleff*, 142 S. Ct. at 1589. And indeed, the Court concluded in that case that the government-speech doctrine did not shield the city of Boston from First Amendment liability despite finding that two of the three *Summum* factors pointed toward the relevant expression being government speech. *See id.* at 1590–92. Justice Alito, joined by Justices Thomas and Gorsuch, concurred in the judgment and registered his disagreement with the use of the factors outlined in *Summum* as a "test" for government speech because, as illustrated by the majority opinion, they "cannot provide a principled way of deciding cases." *Id.* at 1598 (Alito, J., concurring in the judgment). Instead, Justice Alito urged courts to focus on whether "the challenged activity constitutes government speech in the literal sense—purposeful communication of a governmentally determined message by a person acting within the scope of a power to speak for the government" while ensuring that the Government "did not rely on a means that abridges the speech of persons acting in a private capacity." *Id.* at 1599. Because, as discussed below, the outcome of this case is clear under either the majority opinion's framework or that of the concurrence, I need not delve further into this split here.

[8] Whether the mural embodies a historically established form of government speech—the first *Summum* factor—is not clear. While of course the District communicates traffic control and safety messages via street markings, the record does not include evidence that the District frequently uses its streets for political or other similarly expressive messages. At the same time, however, the record includes no evidence of private permanent painting of streets for any purpose, so this first factor ultimately supports neither party's case.

send [its] message loud and clear on a very important street in our city." Compl. ¶ 10. Mayor Bowser also referred to the mural as "public art" that would "stay[]." Defs.' Statement ¶¶ 4–5. Meanwhile, the District exercises near-exclusive control over the painting of the city's streets, even if it does so primarily for purposes of traffic control. Though the mural is distinct from the typical uses of street painting by the District, I have no trouble concluding that the public would reasonably conclude that, by virtue of its lasting presence on a major downtown street, combined with the renaming of that portion of the street as "Black Lives Matter Plaza," the mural was a message from the District itself, rather than private expression.

Of course, the record also shows that the District maintained editorial control over the mural. Beyond the role of District workers in the mural's initial creation, the District also repainted the stars in the District flag after activists painted over them while adding the "Defund the Police" portion of the mural (thereby removing the appearance of an "equals" symbol between the two phrases). And the District eventually paved over the "Defund the Police" message altogether, leaving intact the original mural. While the addition of the "Defund the Police" message by activists highlights that the District's control was imperfect, the record shows that the District nonetheless ultimately was in control of the message and content of the mural. Taken all together, then, the facts in the record compel the conclusion that the District was speaking on its own behalf when it helped create, endorsed, and then maintained control over the "Black Lives Matter" mural. The mural therefore is clearly government speech.

Not surprisingly, this is the very conclusion that has already been reached by the two other judges of this court who have had to consider the governmental nature of the mural. *See Penkoski*, 548 F. Supp. 3d at 25–26 (McFadden, J.); *Judicial Watch v. Bowser*, No. 20-cv-1789, 2022 WL 355209 at *4–7 (D.D.C. Feb. 7, 2022) (Chutkan, J.).[9] In both of those cases, my colleagues found that the record showed convincingly at least that the public would reasonably view the Government as the speaker and that the District had exhibited sufficient editorial control over the mural, while finding that the historical use of street murals as a form of governmental communication ultimately supported neither side's case in a material way. Taking these findings together, both judges concluded that the mural was government speech and rejected the plaintiffs' arguments that it was instead part of a public forum. As outlined above, the record in this case presents no basis on which I would disagree with my colleagues.[10]

---

[9] This conclusion is also consistent with that reached by the U.S. District Court of the Southern District of New York and recently summarily affirmed by the U.S. Court of Appeals for the Second Circuit, in which a similar "Black Lives Matter" mural painted on Fifth Avenue in New York City was deemed government speech. *See Women for Am. First v. De Blasio*, 520 F. Supp. 3d 532 (S.D.N.Y. 2021), *aff'd sub nom. Women for Am. First v. Adams*, No. 21-485-cv, 2022 WL 1714896 (2d Cir. May 27, 2022).

[10] Plaintiff's arguments in support of a contrary outcome here are unavailing. Plaintiff makes conclusory assertions that it was not clear who was responsible for the mural, *see* Pl.'s Mot. in Opp. to Defs.' Mot. for Summ. J. at 21, and that "the public likely did not know where [the mural] came from" due to its having been painted quickly overnight and its expressing a message synonymous with that of the protesters, *see id.* at 16–17. At the same time, however, plaintiff acknowledges and indeed alleges that the mural came about as a result of Mayor Bowser's "unilateral action," *id.* at 17, and that defendants painted an expressive message on the street, Pl.'s Reply at 3, while failing to address the import of the undisputed facts of Mayor Bowser's press conference taking credit for the mural and the District's ongoing editorial control over it. Plaintiff also relies on a distinct argument that the mural cannot be government speech because "Black Lives Matter" is a registered trademark, citing the Supreme Court's decision in *Matal v. Tam*, 137 S. Ct. 1744 (2017). Putting aside the validity of the premise that "Black Lives Matter" is, in fact, a registered trademark—a premise the District challenges, *see* Defs.' Reply at 3—SBTC's argument rests on a flawed reading of *Matal*. There, the Supreme Court held only that the Government's *registration* of trademarks was not government speech, and the Government therefore was not shielded from First Amendment liability when it denied registration to certain trademarks it viewed as "disparaging." *Matal*, 137 S. Ct. at 1758–59. Nothing in the Supreme Court's holding or reasoning in *Matal* supports plaintiff's contention that the Government cannot speak using messages that are also trademarks. *Cf. Walker*, 576 U.S. at 205, 208–09 (holding that the state-issued license plates in question, many of which contained trademarked phrases, comprised government speech). *Matal* thus provides no

In sum, then, because the undisputed record in this case leads to the conclusion that the "Black Lives Matter" mural is an expression of the District's own message, the mural is government speech. To the extent SBTC disagrees with the District's chosen message or wishes that the District would adopt and express its own preferred message, it must utilize political channels, rather than the courts, to express its views. *See Shurtleff*, 142 S. Ct. at 1589. SBTC's lone claim of viewpoint discrimination is thus foreclosed as a matter of law, and summary judgment in favor of the defendants is appropriate. *See Summum*, 555 U.S. at 467.

## CONCLUSION

For the foregoing reasons, SBTC's motion for summary judgment is **DENIED**, and the District's cross-motion for summary judgment is **GRANTED**. A separate order consistent with this decision accompanies this Memorandum Opinion.

*[signature]*
RICHARD J. LEON
United States District Judge

---

basis for concluding that the "Black Lives Matter" mural is not government speech simply because the phrase "Black Lives Matter" may happen to also be trademarked.